IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

NICOLE PARSONS,

    Plaintiff,

v.

PACTIV, LLC,

    Defendant.

Case No.: 2:20-cv-00183

Honorable _____

## COMPLAINT

**COMES NOW** Nicole Parsons ("Plaintiff"), by counsel, and states as follows for her Complaint against Defendant Pactiv, LLC ("Pactiv"):

### PARTIES

1. Plaintiff is a resident and citizen of the State of Ohio. For purposes of this Complaint, Plaintiff avails herself of being considered a resident of the State of West Virginia pursuant to *Morris v. Crown Equip. Corp.*, 633 S.E.2d 292 (W. Va. 2006) and W. Va. Code § 56-1-1 as all or a substantial part of the actions addressed herein occurred in Wood County, West Virginia. At all times relevant hereto, Plaintiff was a Pactiv employee under West Virginia law.

2. Pactiv is a Delaware limited liability company with its membership, upon information and belief, residing in the State of Illinois. At all times relevant hereto, Pactiv was engaged in the business of plastics and rubber products manufacturing at 100 Commercial Street, Mineral Wells, West Virginia 26150.

### JURISDICTION AND VENUE

3. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000.00, exclusive of costs and interest, and involves citizens of different states.

4. Venue is proper in the United States District Court for the Southern District of West Virginia pursuant to 28 U.S.C. § 1391(a) as a substantial portion of the events giving rise to the claims herein took place in Wood County, West Virginia, which is within the judicial district of this Court.

**FACTS**

5. On or about September 3, 2017, Plaintiff began work at Pactiv as a Slitter Operator at Pactiv's facility in Mineral Wells, West Virginia. Plaintiff was placed with Pactiv through a Professional Employment Organization.

6. After Plaintiff had been working at Pactiv for approximately six months, she began training with the Extruder Operators during her shifts. Plaintiff had no prior experience as an extruder operator.

7. During operation, the plastics generated by the extruder are fed into accumulators at the end of the extrusion process. That accumulator, in turn, feeds the plastic sheets into a turret winder system loaded with two 60-inch cores, which make up the central component around which the plastic sheets are wound. The winder features one core which is in operation (around which the plastics are being wound) and another, empty core. Once one of the cores is complete (a "full" roll), the roll is removed from the turret winder and taken to the slitter machine.

8. The turret winder process stops once the operating roll is full; however, the extrusion process continues and the accumulators continue to accumulate plastic sheets. As such, one of the key job duties of an extruder operator is to quickly prepare the non-operational core on the turret winder by taping the plastic sheet from the accumulators to the non-operational core. At this time, the non-operational core becomes the operational core, and the full roll is

removed and replaced with a new non-operational core.  Then, the machine is turned back on and plastic begins to feed onto the new operational core at 47 rotations per minute.

9. While the task of completing the change-over could be a one-man job, thus requiring no communication, Slitter Operators or those training on the extruders would occasionally assist the Extruder Operators with change-overs.  Though the job becoming a two-person job creates a need for communication, Pactiv had no policy in place regarding how employees would communicate regarding their job tasks.  With no uniform communication method, employees utilized verbal commands (in an environment requiring hearing protection) or hand signals to indicate that the change-over task was completed.

10. In addition to creating a need for communication, when two employees work together on the change-over process a nip point hazard is created.  Specifically, the Extruder Operator remains at the controls and is responsible for activating the turret winder, while the other employee (in this case, Plaintiff) is completing the change-over.  If the changing employee is not clear of the winder before it is activated by the Extruder Operator, the rolling of the plastic onto the operational core will pin the changing employee's limbs to the core which, in turn, presents a risk of serious injury or death.

11. Pactiv had actual knowledge of this hazard on and prior to March 20, 2018 due to prior incidents and near-misses.

12. Despite knowing about this nip point hazard, Pactiv provided no training regarding the change-over process or how to communicate when the change-over task was completed.  Instead, employees learn by "shadowing" other employees, regardless of their level of experience, and the only written directives pertained to how to complete the change-over process itself and were taped to the machine.

13.     Furthermore, upon information and belief, the already quick process of changing the plastic feed to a new core was even more urgent because one or more of the accumulators on the extruder at issue (line no. 8) was broken or missing.  The change-over process would take place approximately 5–10 times per shift.

14.     On March 20, 2018, Plaintiff was working as a Slitter Operator; however, she had also just begun training on operating the extruders.  At approximately 5:30 p.m., Plaintiff wen to assist Nathan Budd, who was operating extruder line no. 8, with a change-over.  Plaintiff entered the turret area to tape the plastic sheet feed from the accumulators to the new operational core. Plaintiff completed the process of the change-over but, before she was able to get clear of the turret winder, Mr. Budd activated the machine.

15.     The turret winders began to spin while Plaintiff's left hand was still between the plastic sheet and the core; as a result, Plaintiff's left hand was sucked into the nip point that the plastic and core created.  Plaintiff's entire body was pulled in the direction of the rotation and she flipped over the winder twice prior to Mr. Budd turning the machine off.

16.     As a result of this incident, Plaintiff suffered multiple injuries, including: (1) a displaced comminuted and transverse fracture of the left humerus shaft; (2) a crushing injury of the left forearm; (3) a crushing injury of the left hand; (4) radial nerve damage to the left upper arm and forearm; (5) acute post-traumatic headaches; and, (6) a strain of the left Achilles tendon. Plaintiff also suffers from complex regional pain syndrome as a result of the incident, and remains unable to work as of the date of the filing of this *Complaint*.

17.     Furthermore, Plaintiff has sustained additional compensatory damages including, but not limited to:

    a.     pain and suffering, including mental anguish;

    b.     loss of capacity to enjoy life;

    c.    annoyance and inconvenience;

    d.    emotional distress;

    e.    permanent injuries and impairment;

    f.    permanent scarring and disfigurement;

    g.    past and future medical expenses;

    h.    past and future lost income and earning capacity;

    i.    past and future lost services, protection, care and assistance; and,

    j.    other damages incurred as a result of Defendant's conduct.

## COUNT I
## (Deliberate Intent)

18. Plaintiffs repeat and incorporate by reference the allegations contained in paragraphs 1 through 17 of this Complaint as if set forth herein verbatim.

19. On and prior to March 20, 2018, Pactiv violated W. Va. Code § 23-4-2(d)(2)(B), in that:

    i.    a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;

    ii.    the employer, prior to the injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;

    iii.    the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer which rules, regulations and standards were specifically applicable to the work and working condition involved, and were intended to address the specific hazard(s) presented by the alleged specific unsafe working condition;[1]

---

[1] As it pertains to the violations which will prove element (c) of Plaintiff's claim, please see the verified statement of James McIntosh, an OSHA safety standards expert with over 30 years of knowledge and expertise of the workplace safety statutes, rules, regulations and consensus industry safety standards, attached hereto as **Exhibit A**. Mr.

5

    iv.    notwithstanding the existence of the facts set forth in subparagraphs (i) through (iii), inclusive, of this paragraph, the person or persons alleged to have actual knowledge under subparagraph (ii) nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

    v.    Plaintiff suffered a serious compensable injury as defined in section one, article four, chapter twenty-three as a direct and proximate result of the specific unsafe working condition.

20. As direct and proximate result of Pactiv's acts and omissions, Plaintiff suffered the severe and permanent injuries described herein.[2]

**WHEREFORE**, Plaintiff demands judgment against Pactiv for:

    a.    an amount of compensatory damages determined by a jury according to the laws of the State of West Virginia;

    b.    costs and attorney fees expended in prosecution of this matter;

    c.    pre-judgment and post-judgment interest as provided under the law; and

    d.    any and all other relief to which the Court deems Plaintiff is entitled.

**PLAINTIFF DEMANDS A JURY TRIAL ON THE ISSUES OF LIABILITY AND DAMAGES. PLAINTIFF DEMANDS A BIFURCATED JURY PROCEEDING ON THE ISSUE OF WORKERS' COMPENSATION OFFSET.**

                                      **NICOLE PARSONS,**
                                      By Counsel,

---

McIntosh's statement contains and describes (1) his knowledge and expertise of the applicable workplace safety statutes, rules, regulations and/or written consensus industry safety standards; (2) The specific unsafe working condition(s) that were the cause of the injury that is the basis of the complaint; and (3) The specific statutes, rules, regulations or written consensus industry safety standards violated by PAS that are directly related to the specific unsafe working conditions.

[2] Plaintiff's workers' compensation award is currently the subject of ongoing litigation and, therefore, no final award has been as of the date of the filing of this *Complaint*, nor is a final disposition anticipated prior to the expiration of the statute of limitations governing Plaintiff's claims.

*/s/*D. Blake Carter, Jr.
D. Blake Carter, Jr. (WV State Bar # 9970)
David A. Bosak (WV State Bar # 11947)
BAILEY JAVINS & CARTER, LC
213 Hale Street
Charleston, WV 25301
(304) 345-0346 (T) / (304) 345-0375 (F)
jrcarter@bjc4u.com
dbosak@bjc4u.com
Counsel for Plaintiff
